**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

THERESA LAUTEN, as Representative
of the Estate of Brett Lauten,

             Plaintiff,

      v.

VILLAGE OF LISLE,

             Defendant.

No. 18-cv-05943
Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

Plaintiff Brett Lauten (Lauten) was a patrol officer with the Lisle Police Department, who filed suit[1] against the Village of Lisle (the Village) alleging disability discrimination in violation of the Americans with Disability Act (ADA), 42 U.S.C. § 1201 *et seq.* (Count I); retaliation in violation of the ADA (Count II); and discrimination in violation of the Illinois Human Rights Act (IHRA) (Count III). R. 1, Compl.[2] Lauten's ADA disability discrimination and retaliation claims are based on the Village's failure to select Lauten for a detective assignment, and his IHRA claim is based on the Village's termination of his light duty assignment. Before this Court is the Village's motion for summary judgement pursuant to Federal Rule of Civil

---

[1]After the complaint was filed, Lauten passed away from metastatic colon cancer. The Court granted Theresa Lauten's motion for substitution, as representative of the Estate of Brett Lauten. R. 41. As a result, Theresa Lauten, as representative of the Estate of Brett Lauten, substituted in as named plaintiff.

[2]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation.

Procedure 56. R. 69, Mot. Summ. J. For the reasons stated below, the Court grants the motion for summary judgment.

## Background

The following facts are set forth favorably to Lauten, the non-movant, as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 937 (7th Cir. 2003). While the Court draws all reasonable inferences from the facts in Lauten's favor, the Court does not "necessarily vouch[] for their accuracy." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015) (citation omitted); *see also Knopick v. Jayco, Inc.*, 895 F.3d 525, 527 (7th Cir. 2018) (citation omitted) ("Given this summary judgment lens, we do not vouch for the objective truth of all of these facts."). This background section details all material undisputed facts and notes where facts are disputed.

### A. Lauten's Employment

Lauten began working with the Village of Lisle Police Department (the Department) on January 13, 1999 as a patrol officer, and worked as a patrol officer throughout his time with the Department. DSOF ¶ 1.[3] At all relevant times, David Anderson (Anderson) served as Chief of Police. DSOF ¶ 2. Ernest Ertmoed (Ertmoed), at all relevant times was either the Assistant Village Manager, Acting Village Manager, and/or Village Manager. *Id.* The Village has in place a Job Title

---

[3]Citations to the parties' Local Rule 56.1 Statements of Material Facts are identified as follows: "DSOF" for the Village's Statement of Undisputed Facts (R. 70); "Pl.'s Resp. DSOF" for Lauten's Response to the Village's Statement of Undisputed Facts (R. 74); "PSOAF" for Lauten's Statement of Additional Facts (R. 74); and "Def.'s Resp. PSOAF" for the Village's Response to Lauten's Statement of Additional Facts (R. 79).

Classification and Description for Police Officers, which outlines the duties and responsibilities of patrol officers, including the physical skills officers must have for the position. *Id.* ¶ 8.

From 2016 to 2018, Lauten worked the day shift, which was a 12-hour shift from 7:00 a.m. to 7:00 p.m. DSOF ¶ 9. Over a bi-weekly period, the Department would schedule Officer Lauten for three shifts one week and four shifts the next week. *Id.*

In September 2016, Lauten was diagnosed with Stage 4 metastatic colon cancer. DSOF ¶ 10. On or about September 26, 2016, Lauten informed Deputy Chief of Police Robert Munson (Munson), of his diagnosis and told Munson that he would need immediate continuous time off work for treatment for his illness. *Id.* The next day, the Village approved Lauten's request pursuant to the Family Medical Leave Act (FMLA). *Id.* ¶ 11. In addition to informing Lauten of his rights under the FMLA, the Village also advised Lauten that he should provide the Village with a duty status report after his next medical appointment and keep Munson or Village Human Resources Director, Dawn Lange, updated on the status of his medical condition. *Id.*

On September 30, 2016, Lauten's oncologist, Dr. William Broderick (Dr. Broderick), provided the Village with a letter stating that Lauten would need continuous time off from September 26 through October 7, 2016 for cancer treatment and that he would be evaluated on an ongoing basis for his ability to return to work as a patrol officer, which would depend on Lauten's ability to manage the side effects from his treatment. DSOF ¶ 12. Thereafter, Lauten performed light duty work as he was able. *Id.* ¶¶ 13–31.

3

**B. Light Duty Work Assignment**

On October 3, 2016, Lauten submitted a duty status report from Dr. Broderick to the Village. DSOF ¶ 13. Dr. Broderick reported that Lauten was unable to perform the full duties of his patrol officer position for an "unknown" period of time and there was no known date upon which Lauten was anticipated to return to full duty work. *Id*. However, Dr. Broderick authorized Lauten to work for up to six hours per day on light duty work assignments. *Id*.

Per the Village Personnel Handbook, which applied to Lauten in his position as a patrol officer, no employee is entitled to light duty work assignments and the Village is not obligated to create light duty work or "make work" assignments. DSOF ¶¶ 4–5. Moreover, all light duty assignments are to be temporary in nature and never permanent. *Id*. ¶ 5. Specifically, the Village may deny a request for light duty work by an employee who does not reasonably expect to return to work within ninety days, and only will approve light duty assignments that extend beyond ninety days in the "most unusual circumstances." *Id*. ¶ 6; 70-5, Handbook at 4.

Lauten spent a total of approximately seven months on light duty work assignments following his cancer diagnosis. DSOF ¶¶ 14, 31, 36, 44. Besides Lauten, there were two other Village police officers known to have had more than ninety days of light duty work assignments. PSOAF ¶ 82. Specifically, between January and July 2015, the Village assigned Officer Mahoney to approximately six months of light duty, and between October and December 2016 assigned him to approximately two-and-a-half months of light duty. Def's Resp. PSOAF ¶ 82; R. 74-1 at 29–30. Between January

and July 2018, the Village assigned Officer Perrell to six-and-a-half months of light duty work assignments. *Id.* In reply, the Village points out that Lauten spent approximately four months on light duty between February and June 2015, although neither party presents evidence for the basis of that light duty. R. 78, Reply at 10; R. 74-1 at 29.

Ertmoed reviewed Lauten's light duty request. DSOF ¶ 7. When considering the duration of light duty assignments, Ertmoed looked to the Village Personnel Handbook's policies. *Id.* To ensure that shifts are properly staffed when a police officer is assigned light duty, other officers on full duty may have to move from other shifts or work extra shifts for overtime pay. *Id.* ¶ 46.

In response to the October 3, 2016 duty status report, the Village approved Lauten for a light duty work assignment in the Department's records bureau, where he would work up to six hours per day. DSOF ¶ 14. While working light duty in the records bureau, Lauten continued to receive his full pay as a patrol officer despite not performing his normal duties as a patrol officer. *Id.* ¶ 39. Lauten's responsibilities while working light duty in the records bureau included answering citizen questions, answering phones, and other functions of the records clerks. *Id.*

On October 19, 2016, the Village authorized continued light duty work for Lauten in the records bureau for up to six hours per day. DSOF ¶ 15. From October 2016 to February 21, 2017, Lauten performed light duty work in the records bureau, but was not able to work every day because of how his body reacted to his treatments. *Id.* ¶ 17. During this period, Lauten's treatment plan was fluid and it was difficult for

5

him to anticipate how his body would react to his treatments and the results of his regular CT scans. *Id.* ¶ 16. While Lauten attempted to keep the Village informed of his condition during this five-month period, he did not submit a duty status report from Dr. Broderick to the Village until February 21, 2017. *Id.* ¶¶ 16, 18.

Dr. Broderick's February 21, 2017 duty status report authorized Lauten to increase his light duty work from six to eight hours per day, but also stated that Lauten was still not released to perform the duties of a patrol officer and that Lauten's return to full duty work in his patrol officer position remained "unknown." DSOF ¶ 18. In response, the Village authorized continued light duty work for Lauten, but increased the hours to eight hours per day. *Id.* ¶ 20.

On March 27, 2017, Lauten emailed Munson, informing him that Lauten would be continuing chemotherapy treatment for "at least" another eight weeks. DSOF ¶ 21. Lauten did not submit a duty status report from Dr. Broderick with this email. *Id.* Two days later, Lauten and the Village had an interactive meeting during which the Village advised Lauten that light duty work assignments were intended to be temporary in nature, and asked Lauten to start providing the Village with monthly duty status reports. *Id.* ¶ 23. Additionally, the Village told Lauten it had hired new employees for the records bureau, which had previously been short a few employees, and the new employees were to start work on or about April 3, 2017. *Id.* ¶ 24. The Village informed Lauten that, once the new records bureau employees were acclimated to their new positions, his light duty assignment would end. *Id.* ¶ 25. Lauten responded that if the Village could not provide light duty work, he was fine

with staying at home on sick leave because he would still be paid the same amount of money. *Id*. ¶ 26.

On April 17, 2017, Lauten provided the Village with an updated status report from Dr. Broderick, which stated that Lauten was authorized to perform light duty work up to nine hours per day. DSOAF ¶ 27. The report, however, again indicated that Lauten could not perform the duties of his patrol officer position and was not released to full duty work. *Id*. The report also stated that Lauten's anticipated release date for a return to full duty remained "unknown." *Id*.

Lauten also filed on April 17, 2017 a Complaint Information Sheet with the Illinois Department of Human Rights (IDHR). PSOAF ¶ 77. In his complaint, Lauten stated that the Village had determined that it could not accommodate Lauten's physical limitations. *Id*. Lauten asserted a retaliation claim against Anderson. *Id*. Lauten also filed two complaints with the Village for violations of the Village's internal ADA policies. Def.'s Resp. PSOAF ¶¶ 76, 78.

The Village retained the law firm Ancel Glink to investigate Lauten's internal complaints. Def.'s Resp. PSOAF ¶ 78. On May 1, 2017, Ancel Glink issued a report (the Report) after interviewing Lauten, Anderson, and Ertmoed. *Id*. The Report found that since Lauten had not been removed, as of that date, from his temporary assignment, which is a reasonable accommodation provided by the Village, he could not point to any ADA violation in that regard. PSOAF ¶ 78. The Report also stated that, if the Village were to remove Lauten from light duty accommodation, there is no indication that he would lose his job, as Lauten acknowledged during his interview

7

that he has a significant amount of sick leave, so the Report concluded that, even if Lauten were forced to use his sick leave rather than work in a light duty assignment, it is unlikely to be a violation of the ADA. Def.'s Resp. PSOAF ¶ 78 (citing R. 79-1, Report at 8–9[4]).

On May 2, 2017, the Village issued a letter to Lauten advising him that, per the Village's light duty policies, his light duty work assignment would be terminated on May 5, 2017 because his return to full duty as a patrol officer remained uncertain and the Village did not provide indefinite reassignment to different positions. DSOF ¶ 28. Additionally, the Village reminded Lauten that he had exhausted his FMLA leave and would need to use sick days, vacation time, or other paid time off for any additional days off he needed for his treatment and recovery. *Id.* The letter also directed Lauten to continue providing monthly status reports to the Village regarding his condition and anticipated return to full duty work as a patrol officer. *Id.* ¶ 29.

The light duty work did not allow Lauten to perform the duties of his patrol officer position, and he admits that the only accommodation he was requesting from the Village in May 2017 was more light duty work. DSOF ¶ 40. Lauten does not know what kind of light duty work was available at the Village from May 2017 to September 2017 when he was off work. *Id.* ¶ 41.

Approximately three days later, on May 5, 2017, the Village met with Lauten to discuss any concerns he had regarding the termination of his light duty work

---

[4]Because Lauten attached only a portion of the Report to his Statement of Additional Facts, R. 74-1 at 3–4, the Court will consider the full Report attached to the Village's response thereto.

assignment. DSOF ¶ 30. During the meeting, Lauten told the Village that he hoped to return to work as a patrol officer that summer, but Lauten did not submit any documentation from his doctors that he would be able to return do so. *Id*.

Lauten's light duty work assignment with the records bureau formally ended on May 12, 2017, but Lauten continued to receive a paycheck using accrued sick or benefit time. DSOF ¶¶ 31, 38. In June and August 2017, Lauten submitted duty status reports to the Village from his doctor which stated that Lauten could work up to ten hours per day on light duty work, but his return to full duty work as a patrol officer remained uncertain. DSOF ¶¶ 32–33; PSOAF ¶ 81. On September 7, 2017, Dr. Broderick submitted a duty status report to the Village which stated that he released Lauten to perform the full and unrestricted duties of a patrol officer. DSOF ¶ 34. On September 10, 2017, Officer Lauten returned to fully duty work as a patrol officer. *Id*. ¶ 35.

Lauten underwent a performance evaluation for his work between October 1, 2016 and September 30, 2017, during which time he was mostly on light duty and only worked four road patrol shifts. Def.'s Resp. PSOAF ¶ 85. Lauten received a "meets standards" evaluation. *Id*. ¶ 84. However, he did not receive the $1,000.00 performance bonus as that bonus is given to employees who receive an "exceeds standards" evaluation. *Id*.

## C. Lauten's Application for a Detective Assignment

In May 2017, a detective assignment became available in the Department because the Village promoted a current detective to the rank of sergeant. DSOF

¶¶ 51–52. The Department's detective assignment is a temporary assignment held by patrol officers. *Id*. ¶ 50. Patrol officers with detective assignments must be able to perform all duties of the patrol officer position, including the physical requirements of the position. *Id*.

Sergeant Mark Lutz (Lutz) oversaw the selection process for the upcoming opening for the detective assignment. DSOF ¶ 51. Lutz sent an email to all patrol officers within the Department notifying them that there was a detective assignment opening that would begin in June 2017. *Id*. ¶¶ 53, 55. All interested patrol officers were required to submit a letter of interest and resume to Lutz by May 26, 2017, and all interested applicants would be contacted for an interview and short assessment with department staff. *Id*. ¶ 53.

When the detective assignment became available, Lauten was off work and could not perform the duties of a patrol officer with or without accommodation. DSOF ¶ 54. Even so, on May 17, 2017, Lauten emailed Sergeant Lutz and informed him that he was interested in applying for the detective assignment. *Id*. ¶ 56. Lutz was aware of Lauten's cancer diagnosis and restrictions. Pl.'s Resp. DSOF ¶ 71. In addition to Lauten, three other patrol officers applied for the detective assignment, and all underwent the interview and short assessment process. DSOF ¶ 57.

After reviewing each officer's training, qualifications, and performance during the interview and short assessment, Lutz ranked Lauten as the number two candidate for the detective assignment and offered the detective assignment to the number one candidate, Officer Jeremiah Arnold (Arnold). DSOF ¶¶ 57–58, 62.

10

Lutz offered the detective assignment to Arnold for several reasons, including but not limited to, Arnold's completion of evidence technician school and four years of active military service before becoming a police officer. DSOF ¶ 60. Although Lauten denies this statement of fact, he fails to cite to evidence that controverts it, instead citing to a portion of Lutz's declaration in which Lutz stated that he was aware of, but did not consider, Lauten's medical condition and restrictions during the selection process, and that he would have hired Arnold regardless.[5] Pl.'s Resp. DSOF ¶ 60 (citing R. 70-23, Lutz Decl. ¶ 23); N.D. Ill. Local R. 56.1(e)(2)–(3) ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material."); *see also Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).

Lauten claims that he was more qualified for the detective assignment because he had eight more years of experience as a patrol officer and served in the Marines for six years; however, Lauten also acknowledged that time in the Department itself does not always determine the best fit for a specialty assignment. DSOF ¶ 69; Def.'s Resp. PSOAF ¶ 81. Lauten believed—and the Village does not dispute that he held this belief—that he was not selected because of his medical condition and because he was asked whether would be prepared to work on June 13, 2017. DSOF ¶ 74. However, as noted above, in his Response to the Village's Statement of Undisputed

---

[5]Lauten denied the Village's statement of fact stating that, "[a]lthough Sgt. Lutz was aware of [Lauten's] medical condition and restrictions during the selection process, he did not consider [Lauten's] condition or work restrictions in making his selection and would have made the same decision to select Officer Arnold regardless of the same." Pl.'s Resp. DSOF ¶ 71. However, the Village's statement of fact relies on the same paragraph of Lutz's declaration cited in Lauten's response the Village's statement of fact no. 60, and in denying statement of fact no. 71, Lauten does not cite to any evidence, let alone evidence controverting the statement. It therefore is deemed admitted. N.D. Ill. Local R. 56.1(e)(2)–(3).

Facts, Lauten acknowledged that Lutz, while aware of Lauten's medical condition, did not consider it when making his decision. Pl.'s Resp. DSOF ¶ 60.

The parties also agree that Lauten was ranked lower in the selection process than Arnold because, unlike Arnold, Lauten was not an evidence technician and he did not perform as well as Officer Arnold during the interview process. Pl.'s Resp. DSOF ¶ 62. However, the parties dispute whether having an evidence technician certification was the most important criteria in the selection for the detective assignment. *Id.* ¶ 61. But they agree that Lutz told Lauten that he could improve his chances for being selected for a detective assignment by obtaining more training and becoming an evidence technician. *Id.* ¶ 63. Moreover, Lutz reiterated these recommendations to Lauten when Lauten sent two follow-up emails asking why he had not been chosen for the detective assignment. *Id.* ¶ 64. And Lauten agreed that being an evidence technician would be an asset for detective. *Id.* ¶ 68. Lutz sent an email to Munson before responding to Lauten's emails, asking how he should respond to Lauten's emails. Def.'s Resp. PSOAF ¶ 89.

Additionally, in March 2018 Lauten applied for a Field Training Officer position, which included a $1,500.00 stipend and 1.5 hours of overtime pay for every hour he trained an officer. Def.'s Resp. PSOAF ¶ 86. The Village ultimately postponed selecting a Field Training Officer. *Id.*

Lauten subsequently filed suit against the Village asserting two claims under the ADA based on the denial of his application for the detective assignment, and one

under the IHRA based on his request for continued light duty assignments. Compl. The Village's motion for summary judgment is before the Court. Mot. Summ. J.

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 256. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936 (7th Cir. 2022) (internal quotation marks and citations omitted). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d

697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2).

## Analysis

### I.     Counts I and II (ADA)

Lauten's complaint asserts two claims under the ADA based on denial of his application for the detective assignment: (1) disability discrimination and (2) retaliation. The Village argues that it is entitled to summary judgment on Counts I and II because Lauten was not a "qualified individual" under the ADA when he applied for and was denied the detective assignment. R. 73, Memo. Summ. J. at 5–6. Alternatively, posits the Village, even if Lauten was qualified, it is still entitled to summary judgment on Counts I and II because Lauten cannot prove that his disability or his reporting of it was the "but for reason" he was not selected for the detective assignment. *Id.* at 6–12. The Court examines each count in turn.

### A. Disability Discrimination (Count I)

The "ADA prohibits employers from discriminating against qualified individuals due to a disability." *Rowlands v. United Parcel Serv.-Fort Wayne*, 901 F.3d 792, 798 (7th Cir. 2018) (citation omitted). Traditionally, a plaintiff can "proceed under either the direct or indirect method of proof to establish his claim." *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 853 (7th Cir. 2015). To prove a disability discrimination claim under the direct method, a plaintiff must show that: (1) he is disabled; (2) he is otherwise qualified to perform the essential functions of the job with or without a reasonable accommodation; (3) he suffered an adverse employment

14

action; and (4) the adverse action was caused by his disability. *Kurtzhals v. City of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020). Under the indirect method, the plaintiff must first "establish[ ] a prima facie case by showing: (1) that [she] is disabled under the ADA; (2) that [she] was meeting [her] employer's legitimate expectations; (3) that [she] suffered an adverse employment action; and (4) that similarly situated employees without a disability were treated more favorably." *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 684 (7th Cir. 2014). In recent years, the Seventh Circuit has moved away—while not abandoning completely—these two methods, and instead instructing that, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The ultimate question, then, is whether there is evidence that "would permit a reasonable factfinder to conclude that the plaintiff's [disability] caused the discharge or other adverse employment action." *Id.*

Lauten has the burden to establish that he was a qualified individual at the time of employment decision. *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 628 (7th Cir. 2020) ("At summary judgment, it is the plaintiff's burden to provide evidence such that a rational jury could find [him] to be a qualified individual."). Under the ADA, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see also Stern v. St. Anthony's*

15

*Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015). Whether an individual is a "qualified individual" is to be determined at the time of the employment decision. *Hamm v. Exxon Mobil Corp.*, 223 F. App'x 506, 508 (7th Cir. 2007); *see also Castaneda v. Bd. of Educ. of City of Chicago*, 2019 WL 12528941, at \*1 (N.D. Ill. Aug. 26, 2019). The Seventh Circuit applies a two-step test to determine whether a person is a "qualified individual": "First, we consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc. . . . If he does, then we must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." *Stern*, 788 F.3d at 285. Here, the Village does not dispute that Lauten satisfied the prerequisites for the detective position (and thus that he satisfies the first step). *See* Memo. Summ. J. So the Court turns to the second step of the analysis.

The Village argues that Lauten has not adduced any evidence demonstrating that, at the time of the employment decision, he could perform the essential functions of the detective position, with or without reasonable accommodation. Memo. Summ. J. at 5–6. The Court agrees.

 It is undisputed that the Department's detective assignment is a temporary assignment held by patrol officers. Pl.'s Resp. DSOF ¶ 50. It is equally uncontested that patrol officers with detective assignments must be able to perform all duties of the patrol officer position, including the physical requirements of the position. *Id*. The undisputed evidence reveals that in May and June 2017—when Lauten applied for

the detective assignment, Lutz made the employment decision, and Arnold began working the detective assignment—Lauten's physician, Dr. Broderick, deemed him medically unable to perform the essential functions of his patrol officer position. Pl.'s Resp. DSOF ¶¶ 27, 32, 36, 53–56, 58, 66. Indeed, as the Village points out, Lauten admitted that during the time of the detective selection process, he was off work and unable to perform the duties of the patrol officer position. *Id.* ¶ 54; Memo. Summ. J. at 5.

Lauten fails to respond to the Village's argument as to whether he could perform the essential functions of the detective position (or the patrol officer position) with or without reasonable accommodations in his Response.[6] Accordingly, Lauten has waived any response to whether he was able to perform the essential functions of the detective position. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver.").

As a result, the Court agrees with the Village that Lauten failed to meet his burden in establishing that he was a qualified individual at the time of his application for the detective assignment. Because Lauten has failed to show a triable question of fact on the question of whether he is a qualified individual, his discrimination claim

---

[6]Although Lauten includes an argument under section heading titled, "Officer Lauten was a Qualified Individual Under the ADA and Defendant Perceived Him to Have a Disability," the argument itself relates to Ertmoed's decision not to extend Lauten's light duty work, a claim Lauten brings under the IHRA. Resp. at 11–12. Accordingly, the Court addresses Lauten's argument as it applies Count III. To the extent Lauten attempts to argue that further light duty would have been a reasonable accommodation for the detective position, that argument falls flat, as he admitted that he could not perform the duties of the patrol officer position— which are a prerequisite for performing the duties of the detective assignment—with or without accommodation, at the time Lauten applied for the detective position and Lutz made the employment decision. Pl.'s Resp. DSOF ¶¶ 27, 32, 36, 50, 53–56, 58, 66.

fails as a matter of law. *See Kotaska*, 966 F.3d at 632. Accordingly, the Court does not address the Village's remaining arguments as to Lauten's disability discrimination claim.

### B. Retaliation

In Count II, Lauten alleges a claim for retaliation. To succeed on a claim for retaliation under the ADA, a plaintiff must demonstrate that: "(1) [he] engaged in protected activity, (2) [his] employer took an adverse action against [him], and (3) there was a 'but for' causal connection between the two." *Parker*, 39 F.4th at 936 (internal quotations and citations omitted).

The Village advances two arguments for summary judgment on Lauten's retaliation claim. First, the Village argues it is entitled to summary judgment on Lauten's ADA retaliation claim because he was not a "qualified individual". Memo. Summ. J. at 5. Second, that Lauten has not presented any evidence that the disclosure of his diagnosis in September 2016 was the "but-for" reason he was not selected for the detective assignment. Memo. Summ. J. at 10. Although Lauten fails to raise it his response, the Village's assertion that Lauten must establish that he is a qualified individual for his retaliation claim is wrong as a matter of law. The Seventh Circuit has held "that even those who are not qualified individuals can maintain a claim for retaliation." *Kotaska*, 966 F.3d at 632 (citing *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 243 (7th Cir. 2018)). Notwithstanding Lauten's failure to address this argument, the Court is obligated to follow Seventh Circuit law. *See Paddock Publications, Inc. v. Chicago Trib. Co.*, 103 F.3d 42, 46 (7th Cir. 1996).

But the Court finds that, with his retaliation claim, Lauten is really alleging a discrimination claim rather than a true retaliation claim. That is, Lauten claims that the Village's decision not to select him for the detective position was in retaliation for Lauten informing the Village of his cancer diagnosis. Compl. ¶¶ 16–17. The Court, however, fails to see how this claim differs from his disability discrimination claim that the Village discriminated against him by not selecting him for the detective position because of his disability. *See* Compl. ¶¶ 8–12. As the Seventh Circuit has held, a plaintiff "may not make an end-run around the 'qualified individual' requirement by simply reframing a discrimination or accommodation claim as one for retaliation." *Rodrigo*, 879 F.3d at 243; *see also Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 859 (7th Cir. 2019); *Corrales v. Westin Hotel Mgmt. LP*, 2019 WL 1762907, at *8 (N.D. Ill. Apr. 22, 2019).

So, for the same reasons the Court found that Lauten's disability discrimination claim fails on the qualified individual element, it too could find his second count, which is really a discrimination claim labeled as a retaliation claim, fails for the same reasons. But, to the extent that Lauten's second count could properly be considered a retaliation claim, the Village's motion for summary judgment based Lauten's failure to establish that he is a qualified individual must be denied, as that is not a requirement for a retaliation claim. So, out of an abundance of caution and because the Village did not raise the argument that the two claims are the same, the Court addresses the Village's second basis for summary judgment.

The Village does not dispute that Lauten engaged in a protected activity (disclosing his cancer diagnosis) or that he experienced an adverse action (not being selected for the detective assignment). *See* Memo. Summ. J. Rather, the Village takes issue with the third element, arguing that Lauten has not presented any evidence that the disclosure of his diagnosis in September 2016 was the "but-for" reason he was not selected for the detective assignment. *Id.* at 10.

As an initial matter, the Court must address a theory raised for the first time in Lauten's response: that he was not selected for the detective assignment in retaliation for filing internal ADA claims and/or the filing of his IDHR complaint. R. 75, Resp. at 3–4, 5, 15. A plaintiff may not "alter radically the factual basis of his complaint at summary judgment" via his response brief. *Whitaker v. Milwaukee Cnty., Wisconsin*, 772 F.3d 802, 808 (7th Cir. 2014) (citing *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996); *Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 806 (7th Cir. 2011)). Accordingly, the Court need not address these bases for Lauten's retaliation claim.

To determine whether there exists a genuine issue of material fact as to whether a plaintiff's protected activity caused his termination, the Court must "consider the evidence as a whole and ask whether a reasonable jury could draw an inference of retaliation." *Parker*, 39 F.4th at 936–37 (internal quotation marks and citations omitted). To show that retaliation is the "but for" reason for his termination, Lauten can use either direct or circumstantial evidence. *Rowlands*, 901 F.3d at 801–02. An admission that the Village fired Lauten in retaliation for his disclosure of his

cancer diagnosis would be direct evidence. *Id.* at 802. The Seventh Circuit has acknowledged that such evidence is rare. The more common evidence plaintiffs present is circumstantial, which includes: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* (internal quotation marks and citations omitted).

The Court agrees that Lauten has not presented direct evidence of retaliation, as Lauten admitted that he was never told that he was not selected for the detective assignment because of his medical condition. Memo. Summ. J. at 6 (citing DSOF ¶ 73); Pl.'s Resp. DSOF ¶ 73. So, the Court must determine whether Lauten has presented sufficient circumstantial evidence to create a question of fact as to whether he would have been selected for the detective position but for his disclosure of his cancer diagnosis.

The Village has presented evidence that Lutz selected Arnold for the detective position for several reasons, including, but not limited to Officer Arnold's completion of evidence technician school, his completion of the Felony Investigative Assistance Team SWAT School (with Top Gun honors), his employment history with their department, his four years of military service before joining the department, and his overall performance during the interview and assessment portion of the selection process. Memo. Summ. J. at 7 (citing DSOF ¶ 60). Lutz stated that he found Arnold's

most important asset to be that he was an evidence technician, whereas the other applicants were not, and the Department had a shortage of evidence technicians at the time. Memo. Summ. J. at 7 (citing DSOF ¶¶ 61, 67). Lutz ranked Lauten as the second candidate behind Arnold because Lauten was not an evidence technician, and because Lauten also performed less favorably in the interview process, both as a candidate and interviewer. Memo. Summ. J. at 7 (citing DSOF at ¶62).

Lauten argues that Lutz's stated reasons for selecting Arnold for the detective position rather than Lauten were pretext for discrimination for three primary reasons: (1) Lauten and Arnold's respective qualifications, (2) the job description for the detective position, and (3) an email Lutz sent to Munson after the selection.

First, Lauten argues that he had superior credentials to Arnold; specifically: "1) eight more years of experience as a police officer than Officer Arnold; 2) six years as a Marine Veteran; 3) experience as a Field Training Officer; 4) experience as a School Resource Officer; and 5) five life savings awards." Resp. at 14. Lauten also points to evidence supporting his own experience handling evidence as a patrol officer. Resp. at 14; PSOAF ¶ 79. As the Village points out, however, Lauten admitted that time in the Department does not always determine the best fit for a specialty assignment. Reply at 5 (citing DSOF ¶ 69); Pl.'s Resp. DSOF ¶ 69. He also does not explain how his other qualifications make him more qualified than Arnold.

Second, and relatedly, Lauten contends that Lutz's explanation for hiring Arnold because Arnold was an evidence technician, which Lutz identified as the "most important criteria" was pretextual because, according to Lauten, "if this experience

22

were so important, applicants would have reasonably expected it to be posted as a requirement." Resp. at 14; Pl.'s Resp. DSOF ¶ 61. The Village, however, counters and the Court agrees, that the evidence shows that being an evidence technician was not a requirement for the job, but rather gave Arnold an edge over the other candidates. Lutz Decl. ¶ 16. Lutz stated in his declaration that "[t]he most important criteria in selecting Officer Arnold for the detective assignment *over the other candidates* was that Officer Arnold was an evidence technician *whereas the other candidates were not*, and the department was low on evidence technicians at that time." *Id.* (emphasis added). Moreover, Lauten conceded that being an evidence technician is an asset for someone in the detective position. Reply at 5 (citing DSOF ¶¶ 61, 68). And importantly, as the Village notes, Lauten does not argue that any of Arnold's qualifications or experience cited by Lutz were false. Reply at 5.

Third, Lauten points to an email that Lauten sent to Lutz after he was not selected, requesting information about why he was not selected and how he could improve as a candidate, which Lutz forwarded to Munson with the text, "Got this email from [Lauten] on Friday. Looking for input on how to respond, if at all." Resp. at 15 (citing PSOAF ¶ 89). Lauten argues that this email "reasonably indicates that Lutz was contacting [Munson] to get help to fabricate a reason why Officer Arnold was selected to be a detective- instead of Officer Lauten." *Id.* However, Lutz's declaration also states that, before Lauten emailed him, Lutz had already spoken to Lauten on the phone and advised him how he could improve his chances of selection the next time. Lutz Decl. ¶ 19. The Village points out that Lauten did not depose

Lutz, and therefore did not question Lutz as to the reason he sent the email, and therefore Lauten's proffered reason is unsupported. Reply at 7.[7] The Court agrees.

"In determining whether an employer's stated reason [for discharge] is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Monroe v. Indiana Dep't of Transportation*, 871 F.3d 495, 505 (7th Cir. 2017) (internal quotation marks and citations omitted). "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Id.* The issues raised by Lauten do not show that the legitimate, nondiscriminatory reasons offered by the Village in support of selecting Arnold instead of Lauten for the detective "was a lie or a sham to cover up discriminatory motives." *Id.* The Court finds that Lauten has presented insufficient evidence to allow a reasonable factfinder to infer pretext and retaliatory intent. Accordingly, summary judgment on Count II for retaliation is also proper.

---

[7]In reply, the Village relies on a supplemental declaration submitted by Lutz to argue that the reason that Lutz sent the email to Munson was because Lutz had already advised Lauten why he had not been selected by telephone, so Lutz did not know why Lauten was again asking via email and wanted Munson's input as to how to respond. Reply at 7–8 (citing R. 79-3, Lutz Suppl. Decl. ¶ 5). However, the Court will not consider new evidence and arguments raised on reply, as the Seventh Circuit has stated that "[d]istrict courts abuse their discretion when they deny a party a chance to respond to new arguments or facts raised for the first time in a reply brief in support of a motion for summary judgment." *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 968 (7th Cir. 2020); *see also ABC Acquisition Co., LLC v. AIP Prod. Corp.*, 2020 WL 4607247, at *7 (N.D. Ill. Aug. 11, 2020) ("Every time that a party submitted new factual material in support of their reply briefing, the exhibits submitted were disregarded.").

## II.    IHRA Claim

In Count III, Lauten asserts a claim under the IHRA, alleging disability discrimination based on the May 2017 denial of his request for additional light duty. Compl. IHRA claims for disability discrimination are analyzed under the same framework as ADA claims. *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 569 (7th Cir. 2019), *as amended* (Aug. 9, 2019) (quoting *Sangamon Cnty. Sheriff's Dep't v. Illinois Hum. Rts. Comm'n*, 908 N.E.2d 39, 50 (Ill. 2009) ("Illinois courts 'have looked to the standards applicable to analogous federal claims' when evaluating IHRA claims, so we consolidate our analysis of [the ADA and IHRA failure to accommodate] counts.")); *see also Winkfield v. Chicago Transit Auth.*, 435 F. Supp. 3d 904, 909 (N.D. Ill. 2020). The Court applies the same framework to analyze Lauten's IHRA claim as it did to his ADA disability discrimination claim, *see supra* Section I.A, and starts with the qualified individual analysis.

As an initial matter, the Court notes that, although Lauten titles his IHRA claim as a "disability discrimination" claim, really it is a failure to accommodate claim, as, instead of alleging an adverse employment action, he alleges that the Village failed to accommodate him by extending his light duty work past May 12, 2017. To survive summary judgment on a failure to accommodate claim, Lauten must establish that: "(1) he is a qualified individual with a disability; (2) the [Village] was aware of his disability; and (3) the [Village] failed to reasonably accommodate that disability." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015). Because disability discrimination claims and failure to accommodate claims

both include the qualified individual element, and, as discussed herein, the Court finds that Lauten fails to create a triable issue of material fact on that element, it matters not how the claim is labeled or interpreted. Accordingly, the Court will consider Lauten's IHRA claim to be a disability discrimination claim, as both parties did.

The Village contends that Lauten cannot establish that he was a qualified individual in May 2017 when the Village denied him further light duty work because the evidence is undisputed that Lauten was medically restricted from performing the duties of the patrol officer position and did not perform patrol officer duties at any point in time between his diagnosis in September 2016 and his return to full duty on September 10, 2017. Memo. Summ. J. at 13 (citing DSOF ¶¶ 36, 39, 40, 47). The duty status reports submitted from his physician demonstrate that Lauten was limited to performing only light duty work (for an increasing number of hours) from September 2016 through September 2017. Memo. Summ. J. at 13 (citing DSOF ¶ 47). The Village is correct that Lauten has presented no evidence that any accommodation would have allowed him to perform the duties of his patrol officer position—indeed, Lauten admitted that he could not perform the duties of a patrol officer with or without accommodation, Pl.'s Resp. DSOF ¶¶ 54, 70—and that Lauten admits the only accommodation he requested was further light duty work which did not include any duties of his position. Memo. Summ. J. at 13 (citing DSOF ¶ 40).

In response, Lauten argues that the Village impermissibly perceived Lauten to be disabled when he was denied further light duty after May 17, 2017, and that

the Village's decision to deny Lauten continued light duty after that date was based on myth, fear, or stereotype due to his cancer diagnosis. Resp. at 11–12 (citing *Wright v. Illinois Dep't of Corrections*, 204 F.3d 727 (7th Cir. 2000)). The Court agrees with the Village that *Wright* is distinguishable. *See* Reply at 2–3.

In *Wright*, the plaintiff applied for a position as a correctional officer. 204 F.3d at 728. In his application, the plaintiff disclosed an ankle injury which he sustained while in the military. *Id*. The plaintiff filed suit after he was denied the position, alleging discrimination on the perception of disability based upon the disclosure of his ankle injury. *Id*. The court found that, although the defendant had the plaintiff undergo an examination by a physician, it did so only after the plaintiff's initiation of a medical review process, which revealed that plaintiff could not in fact perform the physical requirements of the position. *Id*. The Seventh Circuit affirmed summary judgment in favor of the defendant, finding that the plaintiff did not produce evidence supporting that the defendant regarded him as disabled, and therefore failed to carry his burden that he was denied the position based upon a perception of disability. *Id*. at 732. Lauten argues that the Village acted on the basis of "myth, fear or stereotype" when it did not extend his light duty work in May 2017, because Ertmoed stated in his deposition that light duty for police officers should be extended beyond 90 days in "unusual circumstances," and Lauten's stage 4 colon cancer was an unusual circumstance. Resp. at 12; PSOAF ¶ 80.

The principle articulated in *Wright* and on which Lauten relies, is that an individual should be allowed to proceed on an ADA claim when his employer makes

decisions based upon a perception of disability of an individual who has an impairment that does not in fact substantially limit a major life activity. Resp. at 12–13 (citing *Wright*, 204 F.3d at 731). The Court agrees with the Village that this rationale does not apply here because it is undisputed that from September 2016 through September 2017, Lauten did in fact have a disability that left him medically unable to perform the duties of his position. Reply at 2 (citing DOSF ¶¶ 36, 39–40, 47). The Court agrees with the Village that *Wright* does not support Lauten's position. The evidence before the Court establishes that Lauten was not able to perform the essential functions of the patrol officer position with or without a reasonable accommodation.

The Court turns to Lauten's argument that his condition was an "unusual circumstance" such that the Village should have extended his light duty. Resp. at 12. It is undisputed that Lauten had been on continuous light duty for approximately seven months in May 2017. Reply at 4; Pl.'s Resp. DSOF ¶¶ 14, 31, 36, 44. The Village points out that pursuant to the Village's policy, no employee is entitled to a light duty assignment, and light duty is intended to be a temporary, not permanent assignment. Memo. Summ. J. at 14 (citing DSOF ¶ 5). The Village notes that light duty requests may be denied if an employee does not reasonably expect to return to regular duty within ninety (90) days of the request, or any date certain. *Id.* (citing DSOF ¶¶ 44–45, 47). Here, there is simply no evidence that Lauten reasonably expected to return to work within 90 days of his request. Indeed, the evidence reveals that at no time did Lauten provide the Village with an anticipated return to work date; Lauten's

28

return to full duty was merely aspirational. Pl.'s Resp. DSOAF ¶¶ 12–13, 18, 27, 30, 32, 47. Lauten admits that in May 2017, he did not provide any documentation from Dr. Broderick or any other physician regarding any anticipated return to work. *Id.* ¶ 30. As the Village points out, at the time the Village denied Lauten's request for further light duty work in May 2017, the most recent status report from his physician from April 17, 2017 stated that his return date was uncertain. Memo. Summ. J. at 15 (citing DSOF ¶ 27). Lauten's physician did not provide any projected full duty return date until September 7, 2017, when he provided a release to return to full duty. *Id.* (citing DSOF ¶ 34).

True, "the ADA may require an employer to reassign a disabled employee to a different position as reasonable accommodation where the employee can no longer perform the essential functions of their current position." *Stern*, 788 F.3d at 291 (citation omitted). The Seventh Circuit has noted, however, that "there are significant limitations on an employer's potential obligation to reassign a disabled employee as reasonable accommodation." *Id.* (citation omitted). "Occasional opportunities to work in another department are not equivalent to a vacancy for a permanent position." *Rehling v. City of Chicago*, 207 F.3d 1009, 1015 (7th Cir. 2000), *amended* (Apr. 4, 2000) (internal quotation marks and citations omitted). The evidence shows that Lauten's light duty work in the records bureau was always going to be temporary, and that the Village informed Lauten in March 2017 that his light duty assignment in the records bureau would be coming to an end because the Village was hiring two new records clerks. *See* Pl.'s Resp. DSOF ¶¶ 24–25. Additionally, Lauten provides no

29

evidence or argument as to any other vacant light duty position for which he was qualified. Pl.'s Resp. DSOF ¶ 41; *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001) (citing 29 C.F.R. pt. 1630. App.) (plaintiff bears the burden to show that a vacant position exists for which he is qualified). Lauten has not presented sufficient evidence to create a question of fact as to whether the Village acted with a discriminatory motive in denying him additional light duty work in May 2017. That conclusion is not altered by Lauten's argument that other officers were treated more favorably than Lauten and allowed longer light duty assignments, as Lauten does not point to any other officer who had a longer continuous light duty assignment. *See* Reply at 10; R. 74-1 at 29–30.

The Court agrees with the Village that Lauten has failed to create a triable issue of fact as to whether he was a qualified individual and whether the Village acted with a discriminatory motive by denying him additional light duty work in May 2017. Accordingly, summary judgment is appropriate on Count III.

### III.   New Claims

To the extent that Lauten attempts to raise new claims in his response based on a performance evaluation in November 2017 and denial of a field officer training assignment in 2018, the Court agrees with the Village that the complaint is devoid of any allegations relating to either claim. Reply at 10–11; Compl. As stated above, Lauten cannot amend his complaint to add new claims via his summary judgment response. *Supra* Section I.B (citing *Whitaker*, 772 F.3d at 808).

## Conclusion

For the foregoing reasons, the Village's motion for summary judgment [69] is granted. The Court enters summary judgment in favor of the Village and against Lauten on Counts I, II, and III. Civil case terminated.

Dated: September 26, 2022

United States District Judge
Franklin U. Valderrama